AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Texas

Sealed
Public and unofficial access
to this instrument is
prohibited by court order.

United States Courts
Southern District of Texas
FILED

JUN 2 1 2018

David J. Bradley, Clerk of Court

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )          Case No.
                                                  )
Caring Angel Healthcare Services, Inc.            )          H18-1000M
10701 Corporate Drive #246                        )
Stafford, Texas 77477                             )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Caring Angel Healthcare Services, Inc., 10701 Corporate Drive #246, Stafford, Texas 77477

located in the _____ Southern _____ District of _____ Texas _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments A, B, and C to the Affidavit in Support of Search Warrant.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Violate the Laws of the United States |
| 18 U.S.C. §§ 1347 & 1349 | Health Care Fraud and Conspiracy to Commit Healthcare Fraud |
| 42 U.S.C. § 1320a-7b | Violation of the Anti-Kickback Statute |
| 18 U.S.C. § 1035 | Healthcare False Statements |

The application is based on these facts:

See attached Affidavit of Special Agent Shannon Brady, Federal Bureau of Investigation

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Shannon Brady, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/21/18

_____
*Judge's signature*

City and state:  Houston, Texas

United States Magistrate Judge Frances H. Stacy
*Printed name and title*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| **In the Matter of the Application by the United States of America for a Search Warrant of:** | § § § § | **UNDER SEAL** |
| **Caring Angel Healthcare Services, Inc. 10701 Corporate Drive #246 Stafford, Texas 77477** | § § § § | **Case No.** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Affiant, being duly sworn, deposes and says as follows:

### IDENTITY AND EXPERIENCE OF AFFIANT

1)      Affiant is a Special Agent of the Federal Bureau of Investigation ("FBI") and has been so employed for approximately 14 years.  While employed by the FBI, Affiant has utilized investigative techniques which include electronic surveillance, physical surveillance, interviewing witnesses, execution of search-and-arrest warrants, and liaison with federal and local authorities.  Affiant has participated in investigations into violations of federal laws and is currently assigned to investigate Healthcare Fraud, 18 U.S.C. § 1347 and 18 U.S.C. § 2, Conspiracy to Commit Healthcare Fraud, 18 U.S.C. § 1349, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Healthcare False Statements, 18 U.S.C. § 1035, Conspiracy to Violate the Laws of the United States, 18 U.S.C. § 371, and Conspiracy to Launder Money, 18 U.S.C. § 1956h.  Since 2008, Affiant has participated in joint investigations of healthcare fraud with the Department of Justice's Houston Medicare Fraud Strike Force, the Health and Human Services Office of Inspector General ("HHS-OIG"), and the Texas Office of the Attorney General's Medicaid Fraud Control Unit ("TXMFCU").

## PURPOSE OF THE AFFIDAVIT

2)      This affidavit is made in support of a search warrant for the following premises, more specifically described in Attachment A, attached hereto and incorporated as if fully set forth within:

**Caring Angel Healthcare Services, Inc. ("Caring Angel")**

**10701 Corporate Drive, Suite 246, Stafford, Texas 77477 ("Subject Premises"), and**

**Angela AKO's cellular phone, phone number 832-659-8053 ("Subject Device")**

3)      As set forth herein, there is probable cause to believe that located at Subject Premises and on Subject Device there exists evidence of crime, fruits of crime, and other items illegally possessed in violation of federal laws, including:  Health Care Fraud, 18 U.S.C. § 1347 and 18 U.S.C. § 2, Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Healthcare False Statements, 18 U.S.C. § 1035, and Conspiracy to Violate the Laws of the United States, 18 U.S.C. § 371, as described in Attachment B.

4)      The statements in this affidavit are based upon Affiant's investigation, information provided to Affiant by Special Agents of the FBI, public source and business records, and Affiant's experience and background as an FBI Special Agent.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, Affiant has not included each and every fact known to me concerning this investigation.

5)      Affiant has set forth only the facts which Affiant believes are necessary to establish probable cause to believe that evidence of a crime, fruits of crime, and other items illegally possessed in violation of federal laws, including Health Care Fraud, 18 U.S.C. § 1347

and 18 U.S.C. § 2, Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Healthcare False Statements, 18 U.S.C. § 1035, and Conspiracy to Violate the Laws of the United States, 18 U.S.C. § 371, are currently located at Subject Premises and on Subject Device.

## THE MEDICARE PROGRAM

6)      The Medicare Program ("Medicare)" is a federal health care program providing benefits to persons who are over the age of 65 or disabled.  Medicare is administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS").  Individuals who receive benefits under Medicare are referred to as Medicare beneficiaries.

7)      Medicare is a health care benefit program, as defined by 18 U.S.C. § 24(b).

8)      Healthcare providers that provide services to Medicare beneficiaries are required to apply for and obtain a "provider number."  Part of this application process requires that the healthcare providers certify that they understand and will abide by the federal laws and regulations governing their participation in Medicare, including a specific understanding of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b).

9)      A health care provider that receives a Medicare provider number is able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.  A Medicare claim is required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services and the name and identification number of the physician or other health care provider that ordered the services.

10) Part A of the Medicare program covers eligible home healthcare services provided by a participating home health agency ("HHA") provided to Medicare beneficiaries who are confined to their homes and have a medical need for skilled nursing care, physical therapy, speech therapy, or an ongoing need for occupational therapy. Claims for qualifying home healthcare services are typically reimbursed in full to the HHA based on contract rates determined by Medicare.

11) Part B of the Medicare program covers eligible physician and outpatient medical services provided by a participating Part B service provider and provided to Medicare beneficiaries with a medical need for the provided service. Claims for qualifying Part B services are typically reimbursed in part to the Part B provider based on contract rates determined by Medicare. For Part B services, Medicare beneficiaries are required to bear financial responsibility for a portion of the Medicare contract rate, typically a twenty percent co-payment, which is paid directly by the Medicare beneficiary to the Part B provider.

12) The Medicare Part A program reimburses 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health care benefits. A patient qualifies for home health care benefits only if the patient:

a. Is confined to the home, also referred to as homebound;

b. Is under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

c. The determining physician signs a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy; the beneficiary was confined to the home; a POC for furnishing services was established and periodically reviewed; and the services were

4

furnished while the beneficiary was under the care of the physician who established the POC.

13)     HHAs are reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare pays Medicare-certified HHAs a predetermined base payment for each 60 days that care is needed.  This 60-day period is called an "episode of care."  The base payment is adjusted based on the health condition and care needs of the beneficiary.  This adjustment is done through the Outcome and Assessment Information Set ("OASIS"), which is a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary is still eligible for care after the end of the first episode of care, a second episode could commence. There are no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary remained eligible.

14)     Medicare Part A regulations require HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the home health agency.  These medical records are required to be sufficient to permit Medicare, including through contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

15)     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare is a POC that includes the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/rehabilitation potential, functional limitations/activities permitted, medications/treatments/nutritional requirements, safety measures/discharge plans, goals, and

physician signature.  Also required is an OASIS, as well as a signed certification statement by an attending physician certifying that the patient is under the physician's care, is confined to his or her home, and needs the planned home health services.

16)     Medicare Part A regulations require that HHAs maintain medical records of each visit made by a nurse, therapist, and home health aide to a beneficiary.  The record of a nurse's visit is required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist, or aide is required to document the hands-on personal care provided to the beneficiary, as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.  These written medical records are generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

## PROBABLE CAUSE

17)     Affiant believes, and has below summarized key facts in support of this belief, that there is probable cause that Angela AKO and Samuel AKO (collectively the "AKOs") conspired to engage in and engaged in health care fraud, that is knowingly and willfully entering into a scheme or artifice to defraud a health care benefit program to obtain money and property owned by, or under the custody or control of, any health care benefit program by means of material false or fraudulent pretenses, representations, and promises, in relation or connection with the delivery of or payment for health care benefits, items, or services.

18)     Affiant believes, and has summarized below key facts in support of that belief, that the AKOs also conspired to and did violate the Anti-Kickback Statute.  There is probable

cause to believe that the AKOs conspired to and did knowingly and willfully pay

remunerations—or aid and abet such payments—specifically, kickbacks and bribes, directly

and indirectly, overtly and covertly, in return for referring individuals for the furnishing and

arranging for the furnishing of any item and service for which payment may be made in whole

or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for

recommending the purchasing, leasing, and ordering of any good, item, and service for which

payment may be made in whole and in part by a Federal healthcare program, that is, Medicare.

19)     On or about December, 2005, the AKOs submitted a Medicare enrollment

application for Caring Angel which was received by Medicare on December 20, 2005.  As part

of that application, Angela AKO represented that she was a Director/Officer and the

Administrator at Caring Angel.  According to those same documents, Samuel AKO represented

that he was also a Director/Officer at Caring Angel.

20)     According to Medicare re-validation documents dated February 7, 2012, the

AKOs represented that they each maintained a 50% interest in the company as

Directors/Officers.  Angela AKO listed her title/position as CEO/Administrator, and Samuel

AKO listed his title/position as CFO.

21)     The AKOs, as part of Caring Angel's Medicare enrollment applications, both

attested to abide by all of Medicare's rules and regulations, including the federal Anti-Kickback

Statute.

22)     According to Medicare data, Caring Angel billed Medicare for approximately

$14 million in home-health services from about January 1, 2008 to about January 8, 2018.

Medicare paid approximately $16.6 million on those claims.

23)    From about March 12, 2008 through about August 24, 2015, Caring Angel submitted approximately $1.1 million and was paid approximately $1.3 million for claims for home healthcare services purportedly approved by Dr. John Ramirez.  From about December 24, 2009 through about February 21, 2015, Caring Angel submitted approximately $1.5 million and was paid approximately $1.7 million for claims for home healthcare services purportedly approved by Dr. Bernadette Iguh.  From about December 9, 2014, to about August 21, 2015, Caring Angel submitted approximately $266 thousand and was paid approximately $328 thousand for claims for home healthcare services purportedly approved by Dr. Wael Aboughali.

24)    On August 25, 2015, federal healthcare fraud search warrants were executed at Amex Medical Clinic, Everbright Medical Clinic, and other locations associated with Dr. John Ramirez.  During the search of Amex Medical Clinic, Annette Etta Amadu entered the Amex Medical Clinic with a stack of home healthcare orders for approval.  Amadu stated that she was an employee at Caring Angel Home Health owned by Angela AKO.  Amadu was dropping off home healthcare re-certification forms for approval at the Amex Medical Clinic and the Everbright Medical Clinic.  Dr. Wael Aboughali was listed as the referring physician on the Amex Medical Clinic forms, and Dr. John Ramirez was listed as the referring physician on the Everbright Medical Clinic forms.

25)    S-72936, a FBI Confidential Human Source, advised that the Everbright Medical Clinic was a location where home healthcare agencies could send referrals and obtain approvals for home healthcare services in exchange for a fee.  Medicare beneficiaries referred to Everbright Medical Clinic were seen by unlicensed individuals, if they were seen at all.  Dr. John Ramirez was not present at the clinic when patients were being seen but would approve home healthcare orders for Everbright Medical Clinic in exchange for weekly payments.

Angela AKO paid Everbright Medical Clinic for home healthcare approvals signed by Dr. John Ramirez. Angela AKO was aware that her patients did not actually come to the Everbright Medical Clinic, and Angela AKO would just bring paperwork to be signed.

26)    S-72936 advised that Amex Medical Clinic was operated by Ann Shepherd and was a location that home healthcare agencies could send referrals to have home healthcare orders approved. In exchange for the approval, home healthcare agencies were required to pay a fee to Shepherd for these approvals. S-72936 advised that Dr. John Ramirez was not present at the Amex Medical Clinic when patients were seen, and the patients were seen by unlicensed individuals, if they were seen at all. Dr. John Ramirez would sign home healthcare orders for the Amex Medical Clinic in exchange for weekly payments from Ann Shepherd. Angela AKO would receive fraudulent home health orders from Amex Medical Clinic.

27)    Bernadette Iguh is a physician who has pleaded guilty to healthcare care fraud violations arising from accepting payment for the approval of home healthcare services and signing home healthcare plans of care for individuals who did not qualify to receive home healthcare services. Iguh identified Samuel and Angela AKO as the owners of Caring Angel and advised that Caring Angel would refer patients to her to be evaluated for home healthcare services. Iguh would approve these patients even if they did not meet the Medicare guidelines necessary for Medicare to pay for home healthcare services. Iguh traveled as far away as Victoria, Texas to conduct face-to-face evaluations for home healthcare services for Medicare beneficiaries on behalf of Caring Angel, and Caring Angel paid Iguh $150 per patient for these evaluations and approvals. Approvals for Caring Angel which occurred inside the Houston area were paid to Iguh at a rate of $100 per patient.

28)     Iguh recalled a time that a Caring Angels marketer from Victoria, Texas brought patients from Victoria, Texas to Iguh's office in Houston, Texas to receive approvals for home healthcare services.  Iguh refused to sign the approvals for these patients because she believed that if the patients could travel from Victoria, Texas to Houston, Texas, it would be obvious that they did not qualify for home healthcare services.

29)     Angela AKO has attempted to get Iguh to sign home healthcare orders for patients Iguh has never seen.  Iguh recalled that the start of care dates on these orders and plans of care pre-dated their presentation to Iguh.  Iguh concluded that claims listing Iguh as the referring physician had been submitted to Medicare for these patients or there would have been no need to present the documents to Iguh for signatures.  Iguh would have arguments with Angela AKO when she refused to sign these types of orders for Caring Angel.

30)     M.T. is a Medicare beneficiary who lives in Bryan, Texas.  Caring Angel submitted 4 claims totaling $8322.14 to Medicare with Start of Care ("SOC") dates 02/25/15, 04/26/15, 6/25/15, and 8/24/15 which identified Dr. John Ramirez as the referring physician for the Medicare claim.  Caring Angel was paid $9693.37 for these claims.

31)     M.T. is confined to a wheelchair, but M.T. receives care from the VA system by traveling on public transportation even though wheelchair bound.  M.T. was offered $200 to sign up for home healthcare services by a black man who did not pay him and never returned.  M.T. does not know Dr. John Ramirez and has never been evaluated for home healthcare services by Dr. John Ramirez.  M.T.'s home healthcare services consisted of a blood pressure check and nothing else.  M.T. was given $40 by one of the representatives of the home healthcare services, and M.T. admitted receiving money for home healthcare services on other occasions.

32)     J.W. is a Medicare beneficiary who lives in Bryan, Texas.  Caring Angel submitted 4 claims totaling $5212.54 to Medicare with Start of Care ("SOC") dates 8/13/14, 10/12/14, 12/11/14, and 2/9/15 which identified Dr. John Ramirez as the referring physician for these claims.  Caring Angel was paid $7848.61 for these claims.

33)     J.W. stated that Dr. John Ramirez is not J.W.'s physician, and J.W. has never been evaluated for home healthcare services by Dr. John Ramirez.  J.W. did not recognize a photograph of Dr. John Ramirez.  J.W. admitted to being paid by Caring Angel to agree to receive the home healthcare services.

34)     S-72936 previously contacted Angela AKO about Everbright Medical Clinic and approvals for home healthcare services via phone calls to Subject Device and phone number 281-498-0020.  Medicare records and home healthcare plans of care bearing the contact information for Caring Angel recovered from search warrants executed at Amex Medical Clinic and Everbright Medical Clinic identify 281-498-0020 as the office number for Caring Angel.

35)     A review of toll records previously obtained for Ann Shepherd, the owner of Amex Medical Clinic, phone number 832-748-4535 identified 148 contacts between Ann Shepherd and Subject Device occurring from September, 2014 to October, 2015.  Similarly, a review of toll records previously obtained for S-72936 identified 7 contacts including 3 text messages between S-72936 and Subject Device occurring between July, 2014 and October, 2014.

## LOCATION OF EVIDENCE

36)     Medicare regulations require that Medicare providers maintain complete and accurate medical records reflecting their patients' medical assessment, diagnoses, and actual treatment.  These medical records must be sufficient to permit Medicare to review the

appropriateness of Medicare payments to the Medicare provider. Under Medicare regulations, such records must be kept for a minimum of seven years from the date of service (42 C.F.R. 424.516).

37)     Samuel AKO and Angela AKO, according to Medicare documents signed on or about February 7, 2012, listed 10701 Corporate Drive, Suite 200, Stafford, Texas as the practice address of Caring Angel Healthcare Services, Inc.

38)     Affiant has reviewed updated Medicare practice address information which identifies 10701 Corporate Drive, Suite 246, Stafford, Texas as the current practice address of Caring Angel Healthcare Services, Inc.

39)     Agents conducted physical surveillance of 10701 Corporate Drive, Suite 246, Stafford, Texas on March 27, 2018. Affixed to Suite 246 is a sign that reads, "Caring Angel Healthcare Svcs. Inc." Affiant conducted physical surveillance again on June 14, 2018 and observed the aforementioned sign.

40)     S-72936 has identified the phone number for the Subject Device, associated with Angela AKO, as a cellular phone used to contact S-72936 in furtherance of obtaining false physician's orders for home healthcare services.

### Potentially Privileged Information

41)     Law enforcement is aware that Sam AKO is a lawyer who maintains an active license with the State Bar of Texas. Sam AKO reports on his public State Bar of Texas page that he maintains a civil law practice in the areas of "Consumer, Litigation: Personal Injury, [and] Immigration." He reports that his law practice is physically located at and address that is approximately 5 miles away from the Subject Premises, at 9800 Centre Pkwy Ste. 825, Houston, TX 77036-8263.

42)     Law enforcement has no evidence to suggest that attorney-client or otherwise privileged materials might be found on the Subject Premises, where the AKOs operate Caring Angel.  Additionally, Samuel AKO indicates his title/position is CFO in Medicare enrollment documents and not that of Attorney.

43)     Out of an abundance of caution, however, law enforcement agents who are not members of the prosecution team will conduct the search of the Subject Premises, and they will not collect documents and communications, if any, that appear to law enforcement to arise out of Sam AKO's law practice, and which are unrelated to his ownership of and involvement with Caring Angel.

44)     Similarly, law enforcement agents who are not members of the prosecution team will conduct the search and seizure of the Subject Device, and they will remove documents and communications, if any, that appear to law enforcement to arise out of Sam AKO's law practice, and which are unrelated to his ownership of and involvement in Caring Angel before the evidence from the Subject Device is provided to the prosecution team.

45)     If, after the prosecution team receives evidence from the Subject Premises or Subject Device pursuant to this protocol, a member of the prosecution team encounters what he or she believes is evidence arising out of Sam AKO's law practice, and which is  unrelated to his ownership of and involvement in Caring Angel, that person will immediately cease reviewing whatever gave rise to that concern, set it aside, and reasonably promptly provide it to an agent and/or attorney who is not a member of the prosecution team to determine whether that piece of evidence should be returned to Sam AKO or may be reviewed by the prosecution team..

46)     Your affiant includes this protocol for the search of the Subject Premises and Subject Device to ensure that, if it is reasonably followed, the members of the prosecution team will not be conflicted off of this case for inadvertent discovery of potentially privileged materials.

## CONCLUSION

47)     Based upon the above information, Affiant believes that probable cause exists to believe there has been a violation of federal laws, including Health Care Fraud, 18 U.S.C. § 1347 and 18 U.S.C. § 2, Healthcare False Statements, 18 U.S.C. §1035, Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and Conspiracy to Violate the Laws of the United States, 18 U.S.C. § 371, and that evidence of those violations exist and are concealed at Subject Premises and contained on Subject Device.

48)     In consideration of the foregoing, I respectfully request that this Court issue a search warrant for Subject Premises and the Subject Device utilized by Angela AKO authorizing the search of that location and device, as described more fully in Attachment A and C and the seizure of items described in Attachment B.


Shannon L. Brady, Special Agent
Federal Bureau of Investigation


Sworn to before me and I find probable cause on this the ____ day of June, 2018.

Hon. Frances H. Stacy
United States Magistrate Judge

**ATTACHMENT A**
**DESCRIPTION OF THE SUBJECT PREMISES**

The property at 10701 Corporate Dr., Stafford, TX 77477 is a multi-story office building. Within this property exist multiple suites, including Suite 246.  Suite 246 bears a placard with, among other information, the name "Caring Angel Health Svcs, Inc." and office hours.  Google Street View and surveillance photographs of the above-referenced property and Suite 246 are incorporated below.

**10701 Corporate Dr., Stafford, TX**





## Suite 246



**ATTACHMENT B**
**DOCUMENTS TO BE SEIZED FROM THE SUBJECT PREMISES**

A.  For the time period from January 2008 to the present:

B.  Items used by, for or on behalf of Caring Angel Healthcare Services, Samuel Ako, or Angela Ako to include:

1.  Patient files and related clinical records, patient testing orders and testing reports used or obtained in patient care, appointment notes, procedure notes, physicians' orders, communication notes, assessments, insurance pre-certifications, follow-up/discharge assessments, other patient assessments, medication profiles, consent forms, office compliance reviews, clinical records reviews, clinical licenses and certifications, correspondences, patient progress notes, and patient visit logs/sign-in sheets.

2.  Forms, or other claims for, or data submitted in support of, payment by Medicare, Medicaid, private insurance, or by a monetary instrument of the patient (such as cash or check).

3.  Remittance advices, receipts, and other records showing payments received from Medicare, Medicaid, private insurance, or by a monetary instrument of the patient.

4.  Inquiry replies and memoranda, notes, correspondence, emails, lists, logs, or ledgers commenting upon or reflecting verification of a patients' eligibility or ineligibility for treatment under Medicare, Medicaid, or private insurance.

5.  Memoranda, notes, correspondence or emails concerning any inspection, review, audit or inquiry from any Federal, State, or local regulatory agency or any private insurance company.

6.  Instructions, advice, policies, procedures, directives, manuals, memoranda, notes and emails relating to coding or billing.

7.  Instructions, lists, memoranda, notes, emails or other documents regarding how to obtain referrals for patients and how to provide referrals for patients; to whom or to what Services(s) to refer for service and to whom or to what Services(s) to avoid referring for service; to which individuals or Services of individuals should services be discouraged; how to schedule patients for services; when and how to verify and bill insurance; and how and why to prepare/structure certifications, procedure notes, or other documentation to obtain payment from government and private health care programs.

8.  Patient ledgers and other documents reflecting services provided to patients by the referenced company or personnel.

9. Memoranda, notes, correspondence emails, tracking logs, satisfaction questionnaires and other records relating to any patient complaints or disputes regarding any services, the billing for such services, or payments to patients of the referenced company or personnel.

10. Personnel and payroll files and records, such as employee lists, documents reflecting names, addresses, duration of employment, personnel files, pay schedules, W-2s, 1099s, commissions, duties and reasons for separation or termination from employment of all present and past officers, employees and independent contractors of the referenced company or personnel.

11. Payroll records, work schedules, time sheets, appointment books, employee notes or summaries, and other records showing the services provided by and all payments made to or for nurses, nurse aids, physicians, physical therapists and other persons providing health services on behalf of the reference company or personnel.

12. Records identifying the names, addresses and phone numbers of medical doctors, medical assistants, licensed nurses, nurse aids, and other persons providing health services on behalf of the referenced company or personnel.

13. Physician lists, referral lists, and other records identifying the names, addresses and phone numbers of persons or entities that have referred patients to the referenced company or personnel.

14. Corporate and business records for the referenced company or personnel, such as articles of incorporation, resolutions, minutes of stockholders and board of directors, meetings, records regarding officers' duties and responsibilities, licensing records, property records, ownership corporate structure, control and ownership of the referenced company or personnel.

15. Bank and brokerage account monthly statements, opening records, checks, wire transfers, check registers, cancelled checks, deposit tickets and records of transfer.

16. Invoices, purchase orders, credit card information, wire transfers, payments, account statements, and investment records.

17. Calendars, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, personal digital assistants (PDAs), emails, and addresses books.

18. Any correspondence, including transmissions by facsimile and stored e-mail, exchanged between any of the referenced company or personnel.

19. Any information described in the proceeding paragraphs stored in electronic or magnetic media, electronic data processing and storage devices, computers and computer systems, including central processing units, internal and peripheral storage

devices such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices such as modems, together with system documentation, operating logs and documentation, software and instruction manuals. Any and all records showing or bearing indicia of the use, ownership, possession or control of the computer equipment, accessories, telephone(s) and modems(s).  Any and all tapes, cassettes, hardware, computer disk, data disks, magnetic media, floppy disk, tape systems, CD ROM disks, optical data storage media, hard disks and other computer relationship operational equipment.

(a)   Your affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of the crime.  In the present case, your affiant requests permission to search and seize records, including that which may be stored on a computer.  Your affiant also requests permission to seize the computer hardware that may contain such records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site.  Based on knowledge of the Medicare system which requires the electronic submission of claims by providers and the use of such electronic submissions at the referenced company offices in relation to the crimes being investigated, and based on the almost universal presence and use of computers in American businesses, including medical businesses, at this time, your affiant believes that, in the present case, computer hardware is a container for evidence, was itself an instrumentality of the crime under investigation, and may be a container for contraband.

(b)  Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

　　1. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

　　2. Searching computer systems requires the use of precise, scientific

procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

3. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

4. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

 (c)  In light of these concerns, Affiant hereby requests the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

(d)  The computer forensic examiner will attempt to create an electronic "image" of all computers that are likely to store the evidence described in the warrant.

Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer forensic examiner or another technical expert will then conduct an off-site search for the evidence described in the warrant from the image copy at a later date.

(e)  If "imaging" proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system that the computer forensic examiner believes must be seized to permit the agents to locate the evidence described in the warrant at an off-site location. The components will be seized and taken into the custody of the agent. If employees the referenced company so request, the computer forensic examiner will, to the extent practicable, attempt to provide the employees with copies of any files not within the scope of the warrant that may be necessary or important to the continuing function of the referenced company's legitimate business. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

(f)  Searching the computer system for the evidence described above will require a range of computer forensic analysis techniques. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. In order to properly execute the search authorized by the warrant, specially trained agents or forensic analysts will be required to conduct a thorough forensic analysis of the seized media, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever computer forensic analysis techniques appear necessary to locate and retrieve the above-described evidence.

## ATTACHMENT C
## DESCRIPTION OF THE CELLULAR DEVICE AND ITEMS TO BE SEIZED

There exists a cellular device, phone number **832-659-8053,** used by, for or on behalf of Angela Ako, which has been utilized as detailed in the attached affidavit.  This device contains electronic records including text messages, call logs, contact information and other Electronically Stored Information (ESI) related to Angela Ako and Caring Angel Healthcare Services, Inc.

A.      This warrant authorizes the physical search and logical extraction of Electronically Stored Information (ESI) for the cellular device associated with phone number 832-659-8053, including, but not limited to contacts, call logs, text messages, emails, photos, videos, online storage accounts, passwords and documents.

B.      This warrant authorizes the search of the physical person of Angela M. Ako, a black female, date of birth 04/04/1965, Social Security Number 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, who resides at 11934 Hueco Tanks Drive, Sugarland, Texas 77498, to the extent necessary to obtain the cellular device described above.

Affiant knows that ESI files may be important to a criminal investigation in two distinct ways:

a.  the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or

b.  the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data.

Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize any ESI that is evidence of crime, contraband, instrumentalities of crime, and/or fruits

of the crime.   In the present case, Affiant requests permission to search and seize records, including those which may be stored on a cellular device.   Affiant also requests permission to seize the cellular device that may contain such ESI if it becomes necessary for reasons of practicality to remove the cellular device and conduct a search off-site.   Based on knowledge of the prevalence of cellular devices and text messages exchanged between the referenced cellular device in relation to the crimes being investigated, and based on the almost universal presence and use of cellular devices in American businesses, including medical businesses, at this time, your affiant believes that, in the present case, the above referenced cellular device is a container for evidence, was itself an instrumentality of the crime under investigation, and may be a container for contraband.

Additional items sought including the above referenced ESI include digital records of the following which may be stored in the referenced cellular device:

1.   Patient files and related clinical records, patient testing orders and testing reports used or obtained in patient care, appointment notes, procedure notes, physicians' orders, communication notes, assessments, insurance pre-certifications, follow-up/discharge assessments, other patient assessments, medication profiles, consent forms, office compliance reviews, clinical records reviews, clinical licenses and certifications, correspondences, patient progress notes, and patient visit logs/sign-in sheets.

2.   Forms, or other claims for, or data submitted in support of, payment by Medicare, Medicaid, private insurance, or by a monetary instrument of the patient (such as cash or check).

3.   Remittance advices, receipts, and other records showing payments received from Medicare, Medicaid, private insurance, or by a monetary instrument of the patient.

4.   Inquiry replies and memoranda, notes, correspondence, emails, lists, logs, or ledgers commenting upon or reflecting verification of a patients' eligibility or ineligibility for treatment under Medicare, Medicaid, or private insurance.

5.   Memoranda, notes, correspondence or emails concerning any inspection, review, audit or inquiry from any Federal, State, or local regulatory agency or any private insurance company.

6.   Instructions, advice, policies, procedures, directives, manuals, memoranda, notes and emails relating to coding or billing.

7.   Instructions, lists, memoranda, notes, emails or other documents regarding how to obtain referrals for patients and how to provide referrals for patients; to whom or to what Services(s) to refer for service and to whom or to what Services(s) to avoid referring for service; to which individuals or Services of individuals should services be discouraged; how to schedule patients for services; when and how to verify and bill insurance; and how and why to prepare/structure certifications, procedure notes, or other documentation to obtain payment from government and private health care programs.

8.   Patient ledgers and other documents reflecting services provided to patients by the referenced company or personnel.

9.   Memoranda, notes, correspondence emails, tracking logs, satisfaction questionnaires and other records relating to any patient complaints or disputes regarding any services, the billing for such services, or payments to patients of the referenced company or personnel.

10. Personnel and payroll files and records, such as employee lists, documents reflecting names, addresses, duration of employment, personnel files, pay schedules, W-2s, 1099s, commissions, duties and reasons for separation or termination from employment of all present and past officers, employees and independent contractors of the referenced company or personnel.

11. Payroll records, work schedules, time sheets, appointment books, employee notes or summaries, and other records showing the services provided by and all payments made to or for nurses, nurse aids, physicians, physical therapists and other persons providing health services on behalf of the reference company or personnel.

12. Records identifying the names, addresses and phone numbers of medical doctors, medical assistants, licensed nurses, nurse aids, and other persons providing health services on behalf of the referenced company or personnel.

13. Physician lists, referral lists, and other records identifying the names, addresses and phone numbers of persons or entities that have referred patients to the referenced company or personnel.

14. Corporate and business records for the referenced company or personnel, such as articles of incorporation, resolutions, minutes of stockholders and board of directors, meetings, records regarding officers' duties and responsibilities, licensing records, property records, ownership corporate structure, control and ownership of the referenced company or personnel.

15. Bank and brokerage account monthly statements, opening records, checks, wire transfers, check registers, cancelled checks, deposit tickets and records of transfer.

16. Invoices, purchase orders, credit card information, wire transfers, payments, account statements, and investment records.

17. Calendars, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, personal digital assistants (PDAs), emails, and addresses books.

18. Any correspondence, including transmissions by facsimile, stored e-mail, text or instant messages exchanged between any of the referenced company or personnel.